Tionna Dolin (SBN 299010)
Email: tdolin@slpattorney.com
(emailservices@slpattorney.com)
**Strategic Legal Practices, APC**
1888 Century Park East, Floor 19
Los Angeles, CA 90067
Telephone: (310) 929-4900
Facsimile: (310) 943-3838

Attorneys for Plaintiff
GERARDO N. ACEVES

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARDO N. ACEVES,<br><br>    Plaintiff,<br><br>  vs.<br><br>KIA AMERICA, INC.; and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No.: 3:22-cv-00340-JLS-NLS<br><br>Assigned to: Janis L. Sammartino<br>Magistrate Judge: Nita L. Stormes<br>Dept.<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF STATUTORY OBLIGATIONS**<br><br>JURY TRIAL DEMANDED |

Strategic Legal Practices, APC
1888 Century Park East, 19th Floor, Los Angeles, CA 90067

Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 because the action alleges claims pursuant to 15 U.S.C. §2310, the Magnuson-Moss Warranty Act, with a claim that exceeds the amount in controversy of $50,000, pursuant to 15 U.S.C. §2310(d)(3)(B).

2.      Furthermore, pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of California because a substantial part of the events or omissions giving rise to the claim occurred within the judicial district.

## GENERAL ALLEGATIONS

3.      As used in this Complaint, the word "Plaintiff" shall refer to Plaintiff GERARDO N. ACEVES.

4.      Plaintiff is a resident of San Diego County, California.

5.      As used in this Complaint, the word "Defendant" shall refer to all Defendants named in this Complaint.

6.      Defendant KIA AMERICA, INC. ("Defendant KIA") is a corporation organized and in existence under the laws of the State of California and registered with the California Department of Corporations to conduct business in California. At all times relevant herein, Defendant was engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in San Diego County, California.

7.      Plaintiff is ignorant of the true names and capacities of the Defendants sued under the fictitious names DOES 1 to 10. They are sued pursuant to Code of Civil Procedure section 474.  When Plaintiff becomes aware of the true names and capacities of the Defendants sued as DOES 1 to 10, Plaintiff will amend this Complaint to state their true names and capacities.

## FACTUAL BACKGROUND

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

8.     On or about December 11, 2015, in California, Plaintiff entered into a warranty contract with Defendant KIA regarding a 2016 Kia Soul vehicle identification number KNDJN2A22G7265053 (hereafter "Vehicle"), which was manufactured and/or distributed by Defendant KIA.

9.     The warranty contract contained various warranties, including but not limited to the bumper-bumper warranty, powertrain warranty, emission warranty, etc. A true and correct copy of the warranty contract is attached hereto as **Exhibit A**. The terms of the express warranty are described in **Exhibit A** and are incorporated herein.

10.     Pursuant to the Song-Beverly Consumer Warranty Act (the "Song-Beverly Act") Civil Code sections 1790, *et seq.* the Subject Vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs have used the vehicle primarily for those purposes. Plaintiff is a "buyers" of consumer goods under the Act. Defendant KIA is a "manufacturer" and/or "distributor" under the Song-Beverly Act.

11.     Plaintiff justifiably revokes acceptance of the Subject Vehicle under Civil Code, section 1794, *et seq.* by filing this Complaint and/or did so prior to filing the instant Complaint.

12.     These causes of action arise out of the warranty obligations of Defendant KIA in connection with a motor vehicle for which Defendant KIA issued a written warranty.

13.     Defects and nonconformities to warranty manifested themselves within the applicable express warranty period, including but not limited to, the electrical system, engine, and transmission, among other defects and non-conformities.

14.     Said defects/nonconformities substantially impair the use, value, or safety of the Vehicle.

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

15.     Each Defendant, whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant, and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for herein.

**Defendant's Knowledge of and Failure to Disclose the Engine Defect**

16.     Defendant, along with Hyundai Motor America, Inc. and their Korean parent entities, released certain vehicles, including the 2011-2013 Hyundai Tucson and the 2012-2016 Kia Soul with a 2.0 or 1.6L GDI engine, which is susceptible to sudden stalling while at any speed and/or to burst into flames ("Engine Defect").

17.     Defendant knew or should have known about the Engine Defect before the Subject Vehicle was offered for sale. Defendant failed to correct the dangerous defect or disclose it to unwary consumers, including Plaintiff.

18.     2012-2016 Kia Souls with the 1.6L engine have catalytic converters that overheat, resulting in catastrophic engine damage and fires. In February 2019, Kia America, Inc. (Defendant) issued a recall for 378,967 Soul vehicles from the 2012 to 2016 model years, all of which have 1.6-liter direct injection gasoline engines. In these engines, the catalytic converter, which reduces pollutants in exhaust emissions, is susceptible to overheating due to—according to Kia—a programming error. When the catalytic converter overheats, abnormal combustion in the engine can result. This can damage the pistons' connecting rods, potentially fracturing the engine block and causing an oil leak. Connecting rod failure, damaged pistons, and a cracked engine block can all cause sudden and catastrophic engine failure during normal driving, and the resulting leakage of oil onto hot engine parts can result in engine fires.

19.     On November 16, 2018, Kia Motor America, Inc. and Kia Motors Corporation (KMC), submitted a response to Defect Petition (DP18-003) for the Kia Soul vehicle and did not identify or report any potential defect trends. Between

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

November 16 and December 5, 2018, KMC analyzed Soul engine claim data and identified a relationship between catalytic converterdamage and engine fires.

20.     Upon KMC's request, DEFENDANT collected data throughout December for an evaluation of defect trends in suspect vehicles. Between January 7 and February 20, 2019, KMC engineers traveled to the United States to inspect 120 collected, potentially hazardous parts. They identified the defect and confirmed the risk of sudden engine stalls and fires. More than three months after Kia's investigation began, KMC decided to conduct a safety recall due to potential risk of fire on February 21, 2019.[1]

21.     This investigation and recall amount to too little, too late. Kia was aware of the dangers of an overheating catalytic converter in these engines since prior to Plaintiff's purchase of the Subject Vehicle. The Safety Recall Report for the February 21, 2019 recall discloses that "[t]he [Electronic Control Unit] ECU logic for the Catalytic Overheating Protection (COP) was changed and improved to prevent overheating of the catalytic converter on July 27, 2016, beginning with the start of the 2017 MY Soul production. However, the 2016 MY Soul production ended on August 11, 2016 with the previous COP ECU logic."[2]

22.     Defendant failed to recall or repair the defective vehicles, including Plaintiffs, leading to hundreds or thousands of engine failures, sudden stalls, and non-collision fires.

23.     Further, Defendant is aware that the recalls it has released have been insufficient to remedy the problem, only making it more difficult for unwary consumers to discover Defendant's wrongful conduct alleged herein.

24.     According to the National Highway Traffic Safety Administration (NHTSA), Hyundai is recalling 120,000 Tucsons, and Kia is recalling over 378,000 Souls with the 1.6-liter "Gamma" engine, each of which suffers from a serious

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

---

[1] 2012-2016 MY Soul Engine Control Unit (ECU) Logic Chronology for NHTSA Recall No. 19V120000 (Feb. 22, 2019), https://static.nhtsa.gov/odi/rcl/2019/RMISC-19V120-6176.pdf (last visited July 1, 2019).
[2] Part 573 Safety Recall Report for NHTSA Recall No. 19V120000 (Feb. 22, 2019), https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V120-1711.PDF (last visited July 1, 2019).

defect. On information and belief, there are another roughly 300,000 Souls equipped with the 2.0-liter "Nu" engine that are also defective but are not currently the subject of any proposed recall. The affected vehicles include: 2012-2016 Kia Soul 1.6-liter, 2012-2016 Kia Soul 2.0-liter, and 2011-2013 Hyundai Tucson.

25. The proposed recall of the Kia Soul covers 375,000 vehicles equipped with one engine—the 1.6-liter "Gamma" engine—but does not address Kia Soul Plus vehicles equipped with what is, on information and belief, a second defective engine, the 2.0-liter "Nu" engine. The 2.0-liter engine is similarly subject to fire risk. For the Hyundai Tucson, Hyundai has announced a recall, but its recall documents indicate that, nearly ten years after these vehicles were manufactured, and after numerous reports of engine fails, stalls, and fires, Hyundai still does not know the cause of the defect and does not have a proposed fix for the recall campaign.

26. 2012-2016 Kia Soul with 2.0-liter engines also suffer from defects that can result in catastrophic failures, stalls, and engine fires. Like the 1.6-liter Kia Soul and numerous other Kia models before it, on information and belief, the 2.0-liter version suffers from a defect or defects that can result in catastrophic failures, stalls, and engine fires. Kia's prior recalls involve manufacturing and design defects that result in oil starvation or lubrication failures. When these conditions occur, the connecting rods between the engine pistons and crankshaft can fail and puncture the engine block. When this occurs, engine oil can leak out of the punctured engine block, contact hot engine components, and ignite engine fires. Even if the engine block is not punctured, connecting rod and rod bearing failures can result in sudden, catastrophic engine failures or stalls at speed, which can be just as dangerous as an engine fire. Kia's proposed recall blames an overheating catalytic converter for this type of failure in the 1.6-liter engines, and has blamed manufacturing problems with oil seals or with metal debris left in engine components for this type of failure in prior recalls of 2.0- and 2.4-liter engines.

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

27. 2.0-liter Kia Souls have suffered engine failures and fires, these vehicles, too, apparently suffer from one or both of the same defects as the 1.6-liter Kia Souls. However, as of yet, Kia has failed to announce any recall or repair for these vehicles.

28. 2011-2013 Hyundai Tucson oil pans were improperly sealed during manufacturing, leading to spontaneous and catastrophic engine stalls and fires. Manufacturing defects leading to oil pan leaks in 2011-2013 Hyundai Tucson vehicles have caused serious risk of harm in the form of spontaneous engine stalling and engine fire.

29. Alongside the Kia Soul recall described above, Hyundai issued a recall of at least 120,000 Tucson SUVs from the 2011 to 2013 model years due to potential engine pan oil leaks caused by insufficient sealing between the oil pan and the engine block. If unaddressed, the engine oil pan leakage may cause engine damage that leads to increased risk of fire or a stalled engine at high speeds. These engines were sold to unsuspecting consumers.

30. Two Hyundai Tucson Safety Recall Reports were submitted on February 5, 2019 and February 15, 2019. Both reports identified that vehicles produced from March 1, 2010, to December 31, 2012, needed to be recalled for safety purposes, but the later Safety Recall Report specified that potentially hazardous Tucson vehicles were equipped with 2.4-liter engines—the same engines identified in the Kia 2011-2012 Sportage recall. More telling, this is also the same engine involved in 2015 and 2017 recalls of other vehicles for engine fire defects, some of which were recalled yet again in 2019 because the fires could recur even after recall repairs were conducted. Based on information NHTSA received from HMC, the recall of Tucson vehicles was required to minimize exposure to risk of stalling or fire.[3]

_Strategic Legal Practices, APC_
_1888 Century Park East, 19th Floor, Los Angeles, CA 90067_

---

[3] Part 573 Safety Recall Report for NHTSA Recall No. 19V063000 (Feb. 5, 2019), https://static.nhtsa.gov/odi/rcl/2019/RCLRPT-19V063-6690.PDF (last visited July 1 , 2019).

**FIRST AMENDED COMPLAINT; JURY TRIAL DEMANDED**

31. Despite the fact that this dangerous defect persists in vehicles manufactured as long ago as 2010, and despite several failed recalls of other models equipped with the same engine over the past several years, as of March 2019 Hyundai still has not identified the cause of the defect or proposed a repair for it, despite agreeing to recall the Tucson.

32. In the past, Hyundai and Kia have recalled numerous other models with GDI engines to repair defects that could lead to engine failures and fires, but these issues have recurred despite the recalls. Hyundai and Kia are recalling many of those vehicles yet again for the same problems. Consumers have every reason to suspect that a recall for the vehicles at issue in this Complaint—which were not part of the previous recalls but appear to suffer from similar defects—at this late date will not be an adequate solution.

33. For example, Defendant issued TSB 05-20-006 in September 2012 (blaming the "engine knock noise [on] the use of an aftermarket oil product" and instructed that any repair made under the same was not a repair covered under warranty), TSB 15-01-048 in December 2015, Recall SC147 in March 2017, and a revision of SC147 in February 2018 (all purporting to be able to repair the engine). Moreover, Defendant issued these TSBs and Recalls for only a limited number of vehicles equipped with the GDI engines, leaving out swaths of vehicles with GDI engines that have been marked by reports of non-collision fires, like the Kia Soul and later model years of the Santa Fe, including the 2016 Kia Soul.

34. Hyundai and Kia alike have concealed these defects for years, despite hundreds of consumer complaints of spontaneous catastrophic engine failures, stalls, and fires. In the case of the Kia Souls with Nu engines, Kia continues to conceal the defects. The recalls now being conducted were forced by a NHTSA investigation that grew in part out of concern over the timeliness and scope of Hyundai's prior recalls for defects that could lead to engine fires in vehicles equipped with similar engines. Congress eventually summoned Kia and Hyundai

Strategic Legal Practices, APC
1888 Century Park East, 19th Floor, Los Angeles, CA 90067

executives to appear and testify about these defects, but these executives refused to appear.

35.     Hyundai and Kia conducted durability testing before these vehicles ever went on sale should have identified the issue. But Defendant has also been on notice for years of the defects through NHTSA complaints and warranty claims, as well as prior recalls of vehicles equipped with the same or similar engines, and have done nothing but conceal the defect until now. The proposed recalls now follow investigations prompted by Defendant's failure to adequately remedy another set of defects that can cause engine fires.

36.     Because of the nature of latent Engine Defect and Defendant's concealment of the same, Plaintiff unknowingly assumed the risk of catastrophic engine failures and fires—and concomitant risk of injury or death—resulting from defects that Defendant knew or should have known about before the Subject Vehicle was ever sold; learned of or should have learned of from the hundreds or thousands of engine failures, fires, and complaints from consumers that followed; and concealed and failed to remedy for years.

**Hyundai and Kia Have a Pattern of Defects That Can Result In Engine Failure and Fires**

37.     Hyundai and Kia are familiar with engine defects and have a track record of failing to adequately remedy them. The companies issued a similar recall in September 2015 after prompting by the NHTSA. Specifically, Hyundai issued Recall No. 15V568000 for 470,000 MY 2011-2012 Hyundai Sonata vehicles manufactured at Hyundai Motor Manufacturing Alabama that were equipped with 2.0-liter and 2.4-liter "Theta II" GDI engines due to reported stalling events and numerous engine-related warranty claims. At the time, Kia did not recall any vehicles, though some shared the same "Theta II" engines.

38.     Unfortunately, in a now-familiar pattern, Hyundai did not recall nearly enough vehicles. In March 2017, Hyundai expanded its initial recall to 572,000 MY

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

2013-2014 Sonata and Santa Fe Sport vehicles with 2.0-liter and 2.4-liter GDI "Theta II" engines for the same manufacturing debris-related issues.

39.     That same day, Kia recalled 618,000 MY 2011-2014 Optima, 2012-2014 Sorento and 2011-2013 Sportage vehicles, all of which had the "Theta II" engine as well. Just like Hyundai's recall, the potentially restricted oil flow to the main bearings could lead to premature bearing wear and eventual bearing failure, causing the engine to stall.

40.     The delay in expanding the recall to all affected vehicles between 2015 and 2017 caught the attention of NHTSA, which launched an investigation in May of 2017 into concerns that both companies' recalls should have been issued earlier. Nearly two more years went by as Hyundai and Kia kept receiving reports of engine fires in vehicles containing Theta II engines.

41.     While NHTSA was investigating the "timeliness and scope" of the March 2017 Sonata and Santa Fe engine recalls, it relayed to Hyundai that there had been a number of engine-stall and spontaneous fire claims for the Tucson equipped with GDI engines. This investigation eventually led to the 2011-2013 Hyundai Tucson and 2011-2012 Kia Sportage oil leak recall described above.

42.     In January 2019, Hyundai recalled 100,000 2011-2014 Sonata and 2013-2014 Santa Fe Sport vehicles, and Kia recalled 68,000 2011-2014 Optima, 2012-2014 Sorento, and 2011-2013 Sportage vehicles. These vehicles had already been involved in an earlier recall that could include engine replacement, but fires could recur despite that purported repair. Hyundai has previously repaired cars with similar defects, only to have the problems recur either because the replacement parts suffered from the same defects or because other parts were damaged by the repair process. Consumers therefore have reason to worry that just recalling and repairing the afflicted vehicles may not solve these serious and dangerous defects.

43.     Alongside the February 2019 recalls of the 1.6-liter Kia Souls and Hyundai Tucsons, DEFENDANT issued another recall of approximately 32,296

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

Sportage vehicles from the 2011 and 2012 model years due to potential oil pan leaks. The affected vehicles are equipped with 2.4-liter engines supplied by HMC's Ulsan plant. Like the explanation Hyundai offers for the Tucson recall, during vehicle assembly these oil pans may have received insufficient sealing, leading to low oil levels that can cause engine damage. A damaged engine can cause the engine to stall, increasing the risk of a crash. Furthermore, oil leaks increase the risk of fire.

44.   Like the explanation Hyundai offers for the Tucson recall, during vehicle assembly these oil pans may have received insufficient sealing, leading to low oil levels that can cause engine damage. A damaged engine can cause the engine to stall, increasing the risk of a crash. Furthermore, oil leaks increase the risk of fire.

45.   In 2019, Kia reviewed engine oil pan replacement warranty claims that had been submitted due to reports of oil leakage. In February 13, 2019, Kia decided to conduct a recall of more than 30,000 Kia Sportage vehicles.

## Defendant Actively Concealed the Engine Defect

46.   The Defendant intentionally concealed, suppressed, and failed to disclose the material fact that the Subject vehicle had design and manufacturing defects that could result in sudden and catastrophic engine stalling, failure, and fire. Defendants knew or should have known the true facts, due to their involvement in the design, installation, calibration, manufacture, durability testing, and warranty service of the engines, catalytic converters, and ECU programming in the Subject Vehicle and others like it. And yet, at no time did Defendant reveal the truth to Plaintiff nor other consumers. To the contrary, Defendant concealed the truth, intending for Plaintiff and other consumers to rely on these omissions. Plaintiff purchased the Subject Vehicle believing, in reliance on Defendants' statements and omissions, it to be safe and free from major engine defects.

47.   Kia's website, press releases, and marketing materials describe "rigorous" testing of both normal and extraordinary driving conditions, over long hours and thousands of miles and in extreme weather and geography, to ensure the

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

**FIRST AMENDED COMPLAINT; JURY TRIAL DEMANDED**

durability of Kia vehicles. Kia's website touts its testing: "We put our engines through rigorous testing in the highest, hottest, and coldest places that a car can possibly be before we put them in our cars."[4] Kia's website goes on to describe several specific durability tests it conducts, under the motto "We run our cars in various ways, identify causes and find solutions to them to make our cars endure over a long time without fault." These tests include: 1. "item durability tests" of individual parts, 2. "module durability tests" of entire assembled components, 3. a "Belgian road test" of driving over rough cobbles to test noise, vibration, and harshness, 4. a "high speed test," 5. a "corrosion test," 6. a "P/T test" of engine performance and temperature, and 7. whole-vehicle safety/crash testing. It further describes testing for extreme weather conditions as well as durability testing conducted on numerous test facilities around the world.

48. Kia therefore knew or should have known about these defects before each affected model year ever went to market as a result of its durability testing

49. Before the 2012 model year went on the market, Kia actively concealed its knowledge of this dangerous defect from consumers and safety regulators alike despite hundreds of reports of catastrophic engine failures.

50. On information and belief, Hyundai conducts similarly rigorous pre-sale durability testing, which should have revealed the existence of the engine defect in the Tucson.

51. Furthermore, numerous owners and lessees of 2012-2016 Soul vehicles equipped with both the 1.6-liter and 2.0-liter engines have submitted complaints about catastrophic engine failures and fires to the National Highway Traffic Safety Administration. Some examples appear below.

2012 Kia Soul – NHTSA ID Number: 11128688
VEHICLE HAS 96000 MILES. WHILE DRIVING ON HIGHWAY BEGAN TO HEAR RATTLING AND PINGING. ATTEMPTED TO MAKE IT TO REST AREA TO PULL OVER AND INSPECT. HEARD

---

[4] http://www.kia.com/worldwide/experience_kia/rnd/performance.do (last visited Mar. 4, 2019).

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

LOUD BANG AND ENGINE STALLED. COASTED INTO REST AREA. INSPECTION REVEALED OIL LEAKING FROM HOLE BLOWN IN LOWER ENGINE BLOCK.

2014 Kia Soul – NHTSA ID Number: 11173144
WHILE DRIVING ON THE HIGHWAY, THE DASH BOARD STARTED TURN OFF AND ON THE CAR BEGAN TO LOSE POWER. I PULLED OFF TO THE SIDE AND THE LIGHTS ON THE DASH CAME ON AND THE CAR SHUT DOWN COMPLETELY.WITHIN A FEW MINUTES SMOKE STARTED COMING FROM THE HOOD OF THE CAR FOLLOWED BY A SMALL FIRE. I GOT OUT OF THE CAR AND THE FIRE GREW AND COMPLETLY BURNED THE CAR.

2016 Kia Soul – NHTSA ID Number: 11180538
AFTER A SHORT DRIVE, I PARKED MY 2016 KIA SOUL IN THE GARAGE AND 15 MINUTES LATER I HEARD A NOISE IN THE GARAGE. MY HUSBAND OPENED THE DOOR TO THE GARAGE AND FOUND FLAMES COMING FROM THE STATIONARY KIA. THE ENTIRE GARAGE CAUGHT FIRE AND INCLUDED MY OTHER CAR WHICH WAS AN INFINITI G35. THE PRIMARY FLAMES WERE COMING OUT OF THE HOOD/FRONT RIGHT FENDER SEAM WITH MINOR FLAMES UNDERNEATH THE KIA. WE KNOW THAT THE FIRE STARTED IN THE PASSENGER SIDE OF THE ENGINE COMPARTMENT OF THE KIA SOUL. THE VEHICLE WAS LESS THAN ONE YEAR OLD, HAD APPROXIMATELY 6000 MILES, AND HAD ONLY BEEN SERVICED ONCE AT THE HENDERSON KIA DEALERSHIP FOR AN OIL CHANGE. … WE HAD TO MOVE OUT OF OUR HOME FOR FIVE MONTHS WHILE THE HOUSE WAS BEING REPAIRED. THERE WAS OVER $142,000 DAMAGE TO OUR HOME AND PERSONAL PROPERTY.

52.    Similarly, numerous owners and lessees of 2011-2013 Hyundai Tucson SUVs:

2012 Hyundai Tucson NHTSA ID Number: 11103584
CATASTROPHIC ENGINE FAILURE ON A 2012 TUCSON WITH ONLY 80K MILES.THE VEHICLE WAS REGULARLY SERVICED. HEARD A FAINT TICKING COMING FROM THE ENGINE WHILE DRIVING, AND LATER THAT DAY, THE ENGINE BLEW. APPARENTLY THE THETA 2 ENGINE THE VEHICLE USES IS KNOWN FOR
FAILURE, BUT THE HYUNDAI DEALERSHIP I TOOK THE VEHICLE TO CLAIMED ONLY ABOUT 2% OF THESE CARS WERE AFFECTED,

AND I WAS JUST "UNLUCKY". NO WARNING LIGHTS, NOTHING. WAS ON THE INTERSTATE DURING RUSH HOUR AT THE TIME OF THE INCIDENT, AND WAS ALMOST HIT BY MULTIPLE VEHICLES BECAUSE OF THIS.

2013 Hyundai Tucson NHTSA ID Number: 11119738
ON JUNE 17, 2018 MY ENGINE BLEW ON MY 2013 TUCSON, LESS THAN 75000 MILES. WE WERE TRAVELING ON THE INTERSTATE AT SPEEDS OF 75 MILES PER HOUR WHEN THE ENGINE BEGAN TO KNOCK THEN LOOSE SPEED. TRAFFIC ALL AROUND US WAS TRAVELING AT 75-80 MILES PER HOUR, VERY SCARY AS WE WERE GOING 10-15 MILES PER HOUR WHEN WE MANAGED TO PULL OFF ON AN EXIT AND THE ENGINE SIMPLY DIED AND NEVER WOULD RESTART. WE HAD TO PUSH IT THROUGH A BUSY INTERSECTION TO A GAS STATION. WE HAD IT TOWED TO THE LOCAL HYUNDAI DEALER WHERE IT STILL SITS 2 MONTHS LATER WAITING ON AN ENGINE TO BE DELIVERED.

53.    Despite the 300-plus vehicle fire reports NHTSA received, Hyundai and Kia representatives initially dismissed the dangers their vehicles posed to consumers, claiming that "[i]n some very rare instances—a rate of less than 1 percent—the affected engines have caught on fire. An exhaustive study has confirmed that there is no defect trend outside of that identified in the related recalls causing non-collision fires in Hyundai vehicles."  Even if this estimate is accurate, 1% of the over 1.7 million or more vehicles Defendants have recalled for engine fire risks so far amount to 17,000 engine fires suffered by American consumers.[5]

54.    Defendants' irresponsibly slow reaction and failure to adequately remedy the stalling and engine fires caused by their defective vehicles drew the interest of the Senate Commerce Committee, which invited the automakers to defend their lack of response. Though they were asked to "promptly identify and respond to defects that may pose a fire risk" at a November 14, 2018 hearing, and despite the ongoing investigation into why hundreds or thousands of their vehicles

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

[5] Kyle Hyatt, *Center for Auto Safety calls out Hyundai and Kia over lack of fire recall,* CNet (Oct. 12, 2018), https://www.cnet.com/roadshow/news/hyundai-kia-center-for-auto-safety-fire-recall (last visited July 1, 2019)

FIRST AMENDED COMPLAINT; JURY TRIAL DEMANDED

were spontaneously bursting into flames, the Hyundai and Kia executives refused to attend the congressional hearing.

55.    In response to Defendants' refusal to appear before Congress, Jason Levine, executive director of the Center for Auto Safety, said: "Until Hyundai and Kia are willing to take responsibility for the three million vehicles on the road that could burst into flames at any minute—with no apparent warning to the driver—we will continue to press for a recall and full and thorough investigation. There has already been one death and a few injuries associated with these vehicle fires. How many people need to be horrifically burned before someone takes action?"[6]

56.    Though more than three years had gone by since the original 2015 recall of vehicles with "Theta II" engines, Kia claimed in late 2018 that the company was working with the Senate committee to "analyze all relevant information associated with any fire or other safety-related matters and will take any necessary corrective action in a timely manner."[7] However, Defendants' failure to respond proactively to these dangerous defects, and lengthy concealment of them, is unsurprising in light of the previous delays and failed recall of the "Theta II" engines.

57.    For the 2011-2013 Hyundai Tucson, despite the announced recall, Hyundai still has not identified or announced the cause of the defect or any proposed repair. For the 2012- 2016 1.6-liter Kia Soul, Kia proposes to simply reprogram the catalytic converter, which may not be permissible under emissions regulations and, in any event, is unlikely to repair an engine defect of this severity. Finally, for the 2012-2016 2.0-liter Kia Soul, Kia has not taken any action. These recalls—or lack thereof—are too little, too late.

---

[6] Jackie Callaway, *Kia, Hyundai CEOs refuse to attend Senate hearing to explain cause of car fires,* ABC Action News (Nov. 8, 2018, updated Dec. 10, 2018), https://www.abcactionnews.com/news/local-news/i-teaminvestigates/kia-hyundai-ceos-refuse-to-attend-senate-hearing-to-explain-cause-of-car-fires (last visited July 1, 2019).

[7] *Id.*

**FIRST AMENDED COMPLAINT; JURY TRIAL DEMANDED**

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

58.     A reasonable consumer would not know that the catalytic converter in Kia Soul vehicles could overheat, resulting in catastrophic engine failure and/or fire. Plaintiff did not know of the facts which were concealed from them by Defendant. Moreover, as an ordinary consumer, Plaintiff did not, and could not, unravel the deception on their own.

59.     Defendant had a duty to disclose that the Engine Defect existed. Defendant had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiff unless and until the defect manifested in the Subject Vehicle. As alleged herein, Defendants denied and concealed the defects in the face of consumer complaints and regulatory investigations. Plaintiff did not, and could not, unravel Defendants' deception on their own.

60.     Defendant also had a duty to disclose the true nature of these vehicles as a result of their prior recalls. By issuing recalls of certain vehicles and representing that these represented the full population of affected vehicles, Defendants led consumers and even safety regulators to believe, at least for a time, that they were remedying the engine fire problems. In fact, these recalls—in addition to being unsuccessful—failed to include hundreds of thousands of additional vehicles that suffered from similar major defects.

61.     Defendants' acts were committed wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of consumers including Plaintiff; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**<u>Some Portions of Plaintiff's Vehicle's Repair History</u>**

62.     The following is a brief summary of some portions of the Subject Vehicle's repair history.

63.     On or about November 7, 2018, with approximately 78,716 miles on odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility with various concerns, including engine concerns. Defendant's authorized repair facility performed repairs

64.     On or about November 26, 2018, with approximately 79,345 miles on odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility with various concerns, including engine concerns. Defendant's authorized repair facility performed repairs, including replacing the engine. The visit took over 30 days.

65.     On or about January 22, 2019, with approximately 80,147 miles on odometer, Plaintiff presented the Subject Vehicle again to Defendant's authorized repair facility with various concerns, including engine concerns. Defendant's authorized repair facility performed repairs.

66.     On or about August 7, 2019, with approximately 96,968 miles on odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair facility for various concerns, including engine concerns. Defendant's authorized repair facility performed repairs.

67.     On or about April 14, 2020, with approximately 112,969 miles on odometer, Plaintiff presented the Subject Vehicle to Defendant's authorized repair for various concerns, including engine concerns. Defendant's authorized repair facility performed repairs.

68.     Thereafter, Plaintiff has continued to experience symptoms of the Engine Defect despite Defendant's representations that the engine was repaired.

69.     Plaintiff discovered Defendants' wrongful conduct alleged herein shortly before the filing of the complaint, when  as the Vehicle continued to exhibit symptoms of defects following Defendant KIA's unsuccessful attempts to repair them. However, Defendant KIA failed to provide restitution pursuant to the Song-Beverly Consumer Warranty Act and/or Magnuson-Moss Warranty Act.

70.     Under the Song-Beverly Act, Defendant FCA had an affirmative duty to promptly offer to repurchase or replace the Subject Vehicle at the time if failed to conform the Subject Vehicle to the terms of the express warranty after a reasonable number of repair attempts.[8]

71.     Defendant KIA has failed to either promptly replace the Subject Vehicle or to promptly make restitution in accordance with the Song-Beverly Act.

72.     Under the Song-Beverly Act, Plaintiff is entitled to reimbursement of the price paid for the vehicle less that amount directly attributable to use by the Plaintiff prior to the first presentation to an authorized repair facility for a nonconformity.

73.     Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code, section 1794, et seq. Plaintiff is entitled to rescission of the contract pursuant to Civil Code, section 1794, et seq. and Commercial Code, section 2711.

74.     Plaintiff is entitled to recover any "cover" damages under Commercial Code, sections 2711, 2712, and Civil Code, section 1794, et seq.

75.     Plaintiff is entitled to recover all incidental and consequential damages pursuant to 1794 et seq. and Commercial Code, sections 2711, 2712, and 2713 et seq.

---

[8] "A manufacturer's duty to repurchase a vehicle does not depend on a consumer's request, but instead arises as soon as the manufacturer fails to comply with the warranty within a reasonable time. (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 301-302, 45 Cal.Rptr.2d 10.) Chrysler performed the bridge operation on Santana's vehicle in August 2014 with 30,262 miles on the odometer—within the three-year, 36,000 mile warranty. The internal e-mails demonstrating Chrysler's awareness of the safety risks inherent in the bridge operation were sent in September 2013, and thus Chrysler was well aware of the problem when it performed the bridge operation on Santana's vehicle. Thus, Chrysler's duty to repurchase or provide restitution arose prior to the expiration of the three-year, 36,000 mile warranty. Moreover, although we do not have the actual five-year, 100,000 mile power train warranty in our record, Santana's expert testified that the no-start/stalling issues Santana experienced were within the scope of the power train warranty, which was still active when Santana requested repurchase in approximately January 2016, at 44,467 miles. Thus the premise of Chrysler's argument—that Santana's request for repurchase was outside the relevant warranty—is not only irrelevant, but wrong." *Santana v. FCA US, LLC,* 56 Cal. App. 5th 334*,* 270 Cal. Rptr. 3d 335 (2020).

76. Plaintiff suffered damages in a sum to be proven at trial in an amount that exceeds $75,000.00.

77. Plaintiff is entitled to all incidental, consequential, and general damages resulting from Defendants' failure to comply with its obligations under the Song-Beverly Act and/or Magnuson-Moss Warranty Act.

## TOLLING OF THE STATUTES OF LIMITATION

### A. Class Action Tolling

78. Under the tolling rule articulated in *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974) ("*American Pipe*"), the filing of a class action lawsuit in federal court tolls the statute of limitations for the claims of unnamed class members until the class certification issue is resolved. In applying *American Pipe* tolling to California cases, the California Supreme Court summarized the tolling rule derived from *American Pipe* and stated that the statute of limitations is tolled from the time of commencement of the suit to the time of denial of certification for all purported members of the class. *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1119 (1988). Tolling lasts from the day a class claim is asserted until the day the suit is conclusively not a class action. *Falk v. Children's Hosp. Los Angeles*, 237 Cal. App. 4th 1454, 1464 (2015).

79. The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

### B. Discovery Rule Tolling

80. Making it even more difficult to discover that the Subject Vehicle's engine suffered from a safety defect was Defendants' issuance of various TSBs and Recalls purporting to be able to fix various symptoms of the defects.

81. As a result of the foregoing, Plaintiff did not become suspicious of

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

Defendant's concealment of the latent defects and its inability to repair it until shortly before the filing of the complaint, when the issue persisted following Defendant's representations that the Vehicle was repaired, and thus contacted Defendant directly.

82.    Plaintiff always acted diligently in presenting the Subject Vehicle for repairs and following the directives of Defendant's authorized repair personnel.

83.    Defendants were under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Defendant Vehicles' suffering from the Defects, and the inevitable repairs, costs, time, and monetary damage resulting from the Defects. Due in part to Defendant's failure to do so, Plaintiff was unable to discover Defendant's wrongful conduct alleged herein until the issues persisted following Defendants attempts to conform the Vehicle to its warranties.

84.    Plaintiff discovered Defendants' wrongful conduct alleged herein until shortly before the filing of the complaint, when Plaintiff requested a buyback and/or restitution of the Subject Vehicle from Defendant KIA as the Vehicle continued to exhibit symptoms of defects following Defendant KIA's unsuccessful attempts to repair them. However, Defendant FCA failed to provide restitution pursuant to the Song-Beverly Consumer Warranty Act and/or Magnuson-Moss Warranty Act.

85.    Plaintiff incorporates herein the portions of Plaintiff's repair history set forth above, by reference.

**C.    The Repair Doctrine**

86.    The statute of limitations is tolled by various unsuccessful attempts to repair the vehicle.[9]

---

[9] See *Aced v. Hobbs–Sesack Plumbing Co.*, 55 Cal.2d 573, 585 (1961) ("The statute of limitations is tolled where one who has breached a warranty claims that the defect can be repaired and attempts to make repairs.") and *A&B Painting & Drywall, Inc. v. Sup. Ct.*, 25 Cal.App.4th 349, 355 (2002) ("Tolling during a period of repairs rests upon the same basis as does an estoppel to assert the statute of limitations, i.e., reliance by the plaintiff upon the words or actions of the defendant that repairs will be made.").

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

87.    Additionally, the limitations period for warranty claims is tolled against a defendant whenever that Defendant claims that the defect is susceptible to repair and attempts to repair the defect.[10]

88.    Here, Defendant undertook to perform various defects repair measures in the form of TSBs and recalls. During the time in which Defendant represented to Plaintiff that the Vehicle was fixable and attempted to fix it, the warranty period may thus have been tolled.

89.    Plaintiff discovered Defendants' wrongful conduct alleged herein until shortly before the filing of the complaint, when Plaintiff requested a buyback and/or restitution of the Subject Vehicle from Defendant KIA as the Vehicle continued to exhibit symptoms of defects following Defendant KIA's unsuccessful attempts to repair them. However, Defendant FCA failed to provide restitution pursuant to the Song-Beverly Consumer Warranty Act and/or Magnuson-Moss Warranty Act.

## FIRST CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT KIA
## VIOLATION OF SUBDIVISION (D) OF CIVIL CODE § 1793.2

90.    Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

91.    Defendant KIA and its representatives in this state have been unable to service or repair the Vehicle to conform to the applicable express warranties after a reasonable number of opportunities.  Despite this fact, Defendant failed to promptly replace the Vehicle or make restitution to Plaintiff as required by Civil Code section 1793.2, subdivision (d) and Civil Code section 1793.1, subdivision (a)(2).

---

[10] "Tolling during a period of repairs generally rests upon the same legal basis as does an estoppel to assert the statute of limitations, i.e., reliance by the plaintiff on the words or actions of the defendant that repairs will be made." *Cardinal Health 301, Inc.*, *supra*, 169 Cal.App.4th at pp. 133–34.

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

92.   Plaintiff has been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2, subdivision (d) and Civil Code section 1793.1, subdivision (a)(2), and therefore brings this cause of action pursuant to Civil Code section 1794.

93.   Defendant's failure to comply with its obligations under Civil Code section 1793.2, subdivision (d) was willful, in that Defendant and its representative were aware that they were unable to service or repair the Vehicle to conform to the applicable express warranties after a reasonable number of repair attempts, yet Defendant failed and refused to promptly replace the Vehicle or make restitution. Accordingly, Plaintiff is entitled to a civil penalty of two times Plaintiff's actual damages pursuant to Civil Code section 1794, subdivision (c).

94.   Defendant does not maintain a qualified third-party dispute resolution process which substantially complies with Civil Code section 1793.22. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiff's actual damages pursuant to Civil Code section 1794, subdivision (e).

95.   Plaintiff seeks civil penalties pursuant to section 1794, subdivisions (c), and (e) in the alternative and does not seek to cumulate civil penalties, as provided in Civil Code section 1794, subdivision (f).

## SECOND CAUSE OF ACTION

## BY PLAINTIFF AGAINST DEFENDANT KIA

## VIOLATION OF SUBDIVISION (B) OF CIVIL CODE § 1793.2

96.   Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

97.   Although Plaintiff presented the Vehicle to Defendant's representative in this state, Defendant and its representative failed to commence the service or repairs within a reasonable time and failed to service or repair the Vehicle so as to conform to the applicable warranties within 30 days, in violation of Civil Code section 1793.2, subdivision (b).  Plaintiff did not extend the time for

1  completion of repairs beyond the 30-day requirement.

2   98.  Plaintiff has been damaged by Defendant's failure to comply with its
3  obligations pursuant to Civil Code section 1793.2(b), and therefore brings this
4  Cause of Action pursuant to Civil Code section 1794.

5   99.  Plaintiff has rightfully rejected and/or justifiably revoked acceptance
6  of the Vehicle, and has exercised a right to request a buyback.  By serving this
7  Complaint, Plaintiff does so again.  Accordingly, Plaintiff seeks the remedies
8  provided in California Civil Code section 1794(b)(1), including the entire value of
9  the Vehicle.  In the alternative, Plaintiff seeks the remedies set forth in California
10 Civil Code section 1794(b)(2), including the diminution in value of the Vehicle
11 resulting from its defects.  Plaintiff believes that, at the present time, the Vehicle's
12 value is *de minimis*.

13  100.  Defendant FCA'S failure to comply with its obligations under Civil
14 Code section 1793.2(b) was willful, in that Defendant KIA and its representative
15 were aware that they were obligated to service or repair the Vehicle to conform to
16 the applicable express warranties within 30 days, yet they failed to do so.
17 Accordingly, Plaintiff is entitled to a civil penalty of two times Plaintiff's actual
18 damages pursuant to Civil Code section 1794(c).

19 **THIRD CAUSE OF ACTION**
20 **BY PLAINTIFF AGAINST DEFENDANT KIA**
21 **VIOLATION OF SUBDIVISION (A)(3) OF CIVIL CODE § 1793.2**

22  101.  Plaintiff incorporates by reference the allegations contained in
23 paragraphs set forth above.

24  102.  In violation of Civil Code section 1793.2, subdivision (a)(3),
25 Defendant failed to make available to its authorized service and repair facilities
26 sufficient service literature and replacement parts to effect repairs during the
27 express warranty period.  Plaintiff has been damaged by Defendant's failure to
28 comply with its obligations pursuant to Civil Code section 1793.2(a)(3), and

therefore brings this Cause of Action pursuant to Civil Code section 1794.

103.   Defendant's failure to comply with its obligations under Civil Code section 1793.2, subdivision (a)(3) was wilful, in that Defendant knew of its obligation to provide literature and replacement parts sufficient to allow its repair facilities to effect repairs during the warranty period, yet Defendant failed to take any action to correct its failure to comply with the law. Accordingly, Plaintiff is entitled to a civil penalty of two times Plaintiff's actual damages; pursuant to Civil Code section 1794(c).

**FOURTH CAUSE OF ACTION**

**BY PLAINTIFF AGAINST DEFENDANT KIA**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(CIVIL CODE, § 1791.1; § 1794; § 1795.5)**

104.   Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

105.   Pursuant to Civil Code section 1792, the sale of the Vehicle was accompanied by Defendant's implied warranty of merchantability.  Pursuant to Civil Code section 1791.1, the duration of the implied warranty is coextensive in duration with the duration of the express written warranty provided by Defendant, except that the duration is not to exceed one-year.

106.   Pursuant to Civil Code section 1791.1 (a), the implied warranty of merchantability means and includes that the Vehicle will comply with each of the following requirements:  (1) The Vehicle will pass without objection in the trade under the warranty contract description; (2) The Vehicle is fit for the ordinary purposes for which such goods are used; (3) The Vehicle is adequately contained, packaged, and labelled; (4) The Vehicle will conform to the promises or affirmations of fact made on the container or label.

107.   At the time of entering into the warranty contract, or within one-year thereafter, the Vehicle contained or developed the defects set forth above. The

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

existence of each of these defects constitutes a breach of the implied warranty because the Vehicle (1) does not pass without objection in the trade under the warranty contract description, (2) is not fit for the ordinary purposes for which such goods are used, (3) is not adequately contained, packaged, and labelled, and (4) does not conform to the promises or affirmations of fact made on the container or label.

108.   Plaintiff has been damaged by Defendant's failure to comply with its obligations under the implied warranty, and therefore brings this Cause of Action pursuant to Civil Code section 1794.

## FIFTH CAUSE OF ACTION
## BY PLAINTIFF AGAINST DEFENDANT KIA
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

109.   Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

110.   Plaintiff is "consumer[s]" as defined in the Magnuson-Moss Warranty Act (referred to as "Mag-Moss"), 15 U.S.C. § 2301(3).

111.   Defendant is a "supplier" and "warrantor" as defined in the Mag-Moss Act, 15 U.S.C. § 2301(4), 15 U.S.C. § 2301(5).

112.   The Subject Vehicle is a "consumer product" as defined in the Mag-Moss Act, 15 U.S.C. § 2301(1).

113.   In addition to the express warranty, in connection with the sale of the Vehicle to Plaintiff, an implied warranty of merchantability was created under California law. The Subject Vehicle's implied warranties were not disclaimed using a Buyer's Guide displayed on the Vehicle; thus any purported disclaimers were ineffective pursuant to 15 U.S.C. § 2308(c).

114.   In accordance with Defendant's warranty, Plaintiff delivered the Vehicle to Defendant's representatives, including its representatives in this state to perform warranty repairs. Plaintiff did so within a reasonable time. Each time

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

Plaintiff delivered the Vehicle, Plaintiff notified Defendant and its representative of the characteristics of the defects. However, the representative failed to repair the Vehicle, breaching the terms of the written warranty on each occasion

115. Defendant violated the Mag-Moss Act when it breached the express warranty and implied warranties by failing to repair the defects and nonconformities, or to repurchase and/or replace the Subject Vehicle.

116. Plaintiff performed all terms, conditions, covenants, promises and obligations required to be performed on Plaintiff's part under the terms of the agreement, express warranty and implied warranty except for those terms and conditions, covenants, promises and obligations or payments for which performance and/or compliance has been excused by the acts and/or conduct of Defendant and/or by operation of law

117. Plaintiff has also met all of Plaintiff's obligations and preconditions to bring this claim, or alternatively it would have been futile for Plaintiff to do so.

118. In addition, Plaintiff has met all of Plaintiff's obligations for bringing this claim as provided in the written warranties, or alternatively, Defendant does not maintain an informal dispute resolution process for the purpose of resolving claims for breach of the implied warranty of merchantability, and does not maintain an informal dispute resolution process for resolving express warranty claims that complies with the requirements of 15 U.S.C. § 2310(a) and the rules and regulations adopted pursuant thereto by the Federal Trade Commission.

119. As a direct and proximate result of the acts and omissions of the Defendant, Plaintiff has been damaged in the form of general, special and actual damages in an amount within the jurisdiction of this Court, according to proof at trial.

120. Under the Act, Plaintiff is entitled to reimbursement of the entire amount paid or payable.

121. Plaintiff is entitled to all incidental, consequential, penalties, and

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

general damages resulting from Defendant's failure to comply with their obligations under the Mag-Moss Act.

122.   Plaintiff has been damaged by Defendant's failure to comply with its obligations under the express warranty, implied warranty, as well as any other violations alleged here, and therefore bring this claim pursuant to 15 U.S.C. §2310(d) and seek remedies available pursuant to Magnuson-Moss Act under California law, including California Civil Code Section 1794 and/or California Commercial Code Sections 2711-2715, and/or other remedies that the Court may deem proper.

123.   Plaintiff is entitled under the Mag-Moss Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action pursuant to 15 U.S.C. § 2310(d)(2).

**SIXTH CAUSE OF ACTION**

**BY PLAINTIFF AGAINST DEFENDANT KIA**

**(Fraudulent Inducement - Concealment)**

124.   Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

125.   Defendant committed fraud by allowing the Subject Vehicle to be sold to Plaintiff without disclosing that the Subject Vehicle and its engine was defective and susceptible to sudden and catastrophic failure.

126.   Indeed, Plaintiff alleges that prior to the sale of the Subject Vehicle to Plaintiff, Defendants knew that the Vehicle and its engine suffered from an inherent defect, was defective, would fail, and was not suitable for its intended use.

127.   Defendant was under a duty to Plaintiff to disclose the defective nature of the Vehicle and its engine, its safety consequences and/or the associated repair costs because:

STRATEGIC LEGAL PRACTICES, APC

1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

a.     Plaintiff is informed, believes, and thereon alleges that Defendants acquired their knowledge of the Engine Defect and its potential consequences prior to Plaintiff acquiring the Vehicle, through sources not available to consumers such as Plaintiff, including but not limited to pre-production testing data, early consumer complaints about the Engine Defect made directly to Defendant and its network of dealers, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendants in response to these complaints, as well as warranty repair and part replacements data received by Defendant from Defendant's network of dealers, amongst other sources of internal information;

b.     Defendant was in a superior position from various internal sources to know (or should have known) the true state of facts about the material defects contained in 2016 Kia Soul engines; and

c.     Plaintiff could not reasonably have been expected to learn or discover of the Subject Vehicle's Engine Defect and its potential consequences until well after Plaintiff purchased the Vehicle.

128.   In failing to disclose the defect in the Subject Vehicle's engine, Defendants have knowingly and intentionally concealed material facts and breached its duty not to do so.

129.   The facts concealed or not disclosed by Defendants to Plaintiff are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Vehicle.  Had Plaintiff known that the Vehicle and its engine were defective at the time of sale, Plaintiff would not have purchased the Vehicle.

130.   Plaintiff is a reasonable consumer who interacted with Defendant's sales representatives and/or reviewed materials disseminated by Defendants concerning Defendants' Vehicles prior to purchasing the Subject Vehicle. Had

FIRST AMENDED COMPLAINT; JURY TRIAL DEMANDED

STRATEGIC LEGAL PRACTICES, APC
1888 CENTURY PARK EAST, 19TH FLOOR, LOS ANGELES, CA 90067

Defendants disclosed the Engine Defect, a safety hazard, to its sales representatives and/or the consumer public, Plaintiff would have been aware of it and would not have purchased the Subject Vehicle.

131. As a result of Defendants' misconduct, Plaintiff has suffered and will continue to suffer actual damages. Plaintiff was harmed by purchasing a vehicle that Plaintiff would not have purchased had Plaintiff known the true facts about the Engine Defect. Further, as a result of Defendant's fraudulent concealment of the Engine Defect, Plaintiff unknowingly exposed herself to the risk of accident, injury, death and liability when she purchased the Subject Vehicle which suffers from a latent safety defect.

## PRAYER

PLAINTIFF PRAYS for judgment against Defendant as follows:

a. For general, special and actual damages according to proof;

b. For restitution;

c. For any consequential and incidental damages;

d. For revocation of acceptance of the Subject Vehicle, rescission, reimbursement and/or restitution of all monies expended;

e. For diminution in value;

f. For a civil penalty in the amount of two times Plaintiffs' actual damages pursuant to Civil Code section 1794, subdivision (c) or (e);

g. For prejudgment interest at the legal rate;

h. For punitive damages;

i. For costs of the suit and Plaintiff's reasonable attorneys' fees pursuant to Civil Code section 1794, subdivision (d);

j. For costs, expenses and attorney's fees reasonably incurred in connection with the commencement and prosecution of this action pursuant to 15 U.S.C. § 2310(d)(2); and

k.    For such other relief as the Court may deem proper.

Dated: March 22, 2022          STRATEGIC LEGAL PRACTICES, APC

BY:    _____/s/ Tionna Dolin_____
       TIONNA DOLIN
       Attorneys for Plaintiff,
       GERARDO N. ACEVES

1  <u>**DEMAND FOR JURY TRIAL**</u>

2  Plaintiff hereby demands a jury trial on all causes of action asserted herein.

3

4

5  Dated: March 22, 2022          STRATEGIC LEGAL PRACTICES, APC

6

7  BY: _____/s/ Tionna Dolin_____

8  TIONNA DOLIN
   Attorneys for Plaintiff,
   GERARDO N. ACEVES

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT; JURY TRIAL DEMANDED**